**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA GEMBUS, | ) | CASE NO:      1:06-cv-00523 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | NANCY A. VECCHIARELLI |
| | ) | |
| THE METROHEALTH SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OF OPINION** |

On December 8, 2006, Defendant The MetroHealth System ("MetroHealth") filed a

Motion for Summary Judgment.[1]  (Doc. No. 23.)  Plaintiff Donna Gembus ("Gembus") filed her

Memorandum in Opposition on January 8, 2007.  (Doc. No. 25.)  MetroHealth filed a Reply brief

on January 23, 3007.  (Doc. No. 26.)  This case is before the undersigned Magistrate Judge

pursuant to the consent of the parties.  (Doc. No. 9.)  For the reasons set forth in detail below,

MetroHealth's Motion for Summary Judgment is GRANTED.

**I. Procedural Background**

On February 2, 2006, Gembus filed a Complaint in the Court of Common Pleas of

Cuyahoga County, Ohio.  On March 7, 2006, Defendant MetroHealth filed a Notice of Removal

---

[1]  Plaintiff Donna Gembus named "The Cleveland Clinic Foundation - The Metrohealth
System Cooperative Services Organization" as the defendant.  On June 6, 2006, the
parties stipulated that "The MetroHealth System" is the proper defendant in this action.
(Doc. No. 18.)

with this Court.  (Doc. No. 1.)  Defendant MetroHealth filed its Answer on March 13, 2006.
(Doc. No. 4.)

## II.  Statement of Relevant Facts

**A.      Gembus's Employment with MetroHealth**.

MetroHealth hired Gembus as a medical assistant in the dialysis department on or around
June 4, 1990. (Gembus Depo. at 9, 11.)  Gembus began suffering from fibromyalgia around 1995
or 1996.  (Gembus Depo. at 22.)  Gembus transferred from the internal medicine department to
the MetroHealth Line Department in 2001 and assumed the duties of a liaison specialist.
(Gembus Depo. at 18-222.)  Liaison specialists answer incoming telephone calls to the
MetroHealth Line and assist callers with a variety of issues, such as setting up appointments,
referring MetroHealth patients and non-patients to various clinics, maintaining physicians'
schedules, and directing pharmacists to the appropriate physicians.  (Gembus Depo.  43-49;
Reimer Aff. ¶3, attached Ex. C.)  The liaison specialist position required Gembus to work
rotating shifts, including working first or second shift, weekdays and/or weekends.  (Gembus
Depo. at 33, 52.)

### 1.      MetroHealth's Tardiness Policy.

At the time Gembus was hired, she received a copy of MetroHealth's employee
handbook that contained the Attendance Standards and Family and Medical Leave policies.
(Gembus Depo. at 13; Reimer Aff. ¶2.)  Gembus signed an acknowledgment that she had
received the handbook.  *Id*.  MetroHealth's Attendance Standards policy states that "[e]mployees
are tardy when they are not at their assigned work station at the start of their shift as defined by
the employee's supervisor."  (Reimer Aff. ¶2, attached Ex. A.)  Under MetroHealth's tardiness

policy, an employee is assessed one point for each instance of tardiness, and tardiness is measured on a rolling twelve12-month period; old points drop off after twelve months.  (Reimer Aff. ¶2, attached Ex. A.)  Accumulation of tardy points leads to progressive disciplinary action: three points – record of discussion; 5 points – verbal warning; 10 points – written warning; 15 points – final written warning; and 20 points – termination.  *Id.*

> **2.** **Gembus's History of Tardiness**.

Gembus accumulated a number of tardiness points while working in internal medicine. (Gembus Depo. at 19.)  At the time Gembus transferred to the position of liaison specialist, she amassed thirteen points.  (Gembus Depo. at 39; Carroll Aff. ¶3, attached Ex. B.)  Following her transfer, by July 2001, Gembus accrued over twenty tardy points, more than the amount required for termination.  (Carroll Aff. ¶4, attached Ex. C.)  Rather than terminating Gembus, MetroHealth opted to discipline her by giving Gembus a one-day suspension for tardiness and falsification of her sign-in sheet.  (Carroll Aff. ¶4, Ex. C.)  Gembus conceded that MetroHealth could have terminated her employment at that time.  (Gembus Depo. at 109.)

Gembus received numerous warnings, both written and oral, over the next few years. (Carroll Aff. ¶5, attached Ex. B and D.)  Gembus never challenged any of her reprimands through the employee grievance procedure.  (Gembus Depo. at 108, 110-115, 121.)  Gembus's pattern of tardiness also was discussed during each of her three employee evaluations while in the liaison specialist position.  (Carroll Aff. ¶6, attached Ex. E; Gembus Depo. at 87, 89, 103-106.)

3

**3.      MetroHealth's Policy of Requiring Employees to Arrive Five Minutes Prior to the Start of their Shift**.

MetroHealth's Line Department had a policy of requiring its employees to log-in for work five minutes prior to the start of their shifts using a telephone sign-in system.  (Gembus Depo. at 84-86; Carroll Aff. ¶2, attached Ex. A.)  MetroHealth employees in the Line Department were permitted to log out ten minutes before the end of their shift – using five minutes to clean their desks.  (Carroll Aff. ¶2, attached Ex. A; Gembus Depo. at 76-77.) Gembus was aware of and understood the early sign-in requirement that became effective in September 2002. (Gembus Depo. at 38, 71, 75, 86; Carroll Aff. ¶2.)  MetroHealth's employees were not compensated for the five minute period prior to the start of their shift, but were, nonetheless, considered tardy if they did not arrive five minutes before their shift commenced. *Id*.  Gembus received four tardies after her return from FMLA leave for not logging-in five minutes prior to her shift, although she did arrive by the time her shift actually commenced. (Carroll Aff. ¶3, attached Ex. B.)[2]

**B.      Gembus's Requests For FMLA Leave and Accommodation**.

In early 2005, Gembus suffered an increase in her fibromyalgia symptoms that she felt was exacerbated by her rotating shifts.  (Gembus Depo. 100, 246.)  Her physician, Dr. Michael Harrington, referred Gembus to MetroHealth's Employee Assistance Program, and she was advised that she take a leave of absence pursuant to the Family and Medical Leave Act ("FMLA").  *Id*.  Gembus applied for and was granted FMLA leave from March 1 to April 1, 2005 for her fibromyalgia and a newly diagnosed condition of chronic fatigue syndrome.

---

[2]  The dates of these tardies are as follows: May 11, 2005; June 3, 2005; June 8, 2005; and June 10, 2005.  (Carroll Aff. ¶3, attached Ex. B.)

(Gembus Depo. at 170-171; Carroll Aff. ¶7.)  She returned to her position as a liaison specialist in April 2005.  (Carroll Aff. ¶7).

In February 2005, Dr. Harrington completed an FMLA medical certification form in which he indicated that Gembus's fibromyalgia "requires steady day shift work without fluctuating shifts in order to manage organization of sleep and circadian rhythms." (Carroll Aff. ¶8, attached Ex. F.)  Thereafter, Gembus requested to be placed on straight daytime shifts. (Carroll Aff. ¶8.)  Gembus's request initially was denied, which prompted her attorney to make a formal written request on April 27, 2005 for accommodation under the Americans with Disabilities Act ("ADA").  (Carroll Aff. ¶8; Reimer Aff. ¶5.)

After the initial denial, MetroHealth asked Gembus to sign a medical records release form in order to obtain additional information from her treating physicians.  (Reimer Aff. ¶6, attached Exs. F and G.)  On May 31, 2005, MetroHealth received an executed release.  (Reimer Aff. ¶7.)  On June 8, 2005, MetroHealth requested information concerning Gembus's medical conditions and day shift request from her treating physicians, Dr. Harrington and Dr. Felicitas Juguilon.  (Reimer Aff. ¶¶7- 8, attached Exs. H, I, and J.)  In the interim, Gembus was given an accommodated work shift from 9:00 a.m. to 5:30 p.m. Monday through Friday and 11:00 a.m. to 7:30 p.m. on weekends.  (Gembus Depo. at 188-189.)

**C.      Gembus's Termination**.

As stated above, Gembus received several tardies after her return from FMLA leave.  On June 10, 2005, Gembus received another point for tardiness, raising her total to twenty-one (21) points.   (Carroll Aff. ¶3, at Ex. B.)  On June 13, 2005, Gembus was terminated for ostensibly reaching the tardiness threshold.  (Reimer Aff. ¶4.)  On that date, a meeting was held between

5

Gembus and several members of MetroHealth's management, including Gembus's supervisor. (Reimer Aff. ¶4; Gembus Depo. 123.)  Gembus was informed that she had accumulated twenty-one tardiness points in the past year, but was given an opportunity to explain her case.  (Gembus Depo. 129.)  MetroHealth avers that Gembus never asserted that her tardiness issues would improve.  (Reimer Aff. ¶4.)

### III.  Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The moving party can meet this burden in two ways: by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing the non-moving party, after adequate time for discovery, has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may rely on depositions, answers to interrogatories, and the like, to demonstrate that the non-moving party has no evidence to prove his case and hence that there can be no factual dispute.  *Id.* at 328 (White, J., concurring).  However, "it is not enough to move for summary judgment ... with a conclusory assertion that the [non-moving party] has no evidence to prove his case."  *Id.*

Once the moving party has met its burden, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial.  *See Cox v. Kentucky Department of Transportation*, 53 F.3d 146, 149 (6th Cir. 1995).  That is, the nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to

6

rely.  *Al-Qudhai'een v. America West Airlines, Inc.*, 267 F. Supp.2d 841, 845 (S.D. Ohio 2003) *citing In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

In assessing the merits of the motion, a Court should "draw all reasonable inferences in favor of the nonmoving party." *Joostberns v. United Parcel Servs., Inc.*, 2006 U.S. App. LEXIS 533 at *8 (6th Cir. 2006).  In addition, the Court "does not weigh the evidence or make credibility determinations." *Id*.; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  In other words, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251 (1986).

## IV.  Analysis

### A.  Claims Under the Ohio Revised Code § 4112.02.

In Count I of her Complaint, Gembus alleges that she was terminated because she had a disability and/or because MetroHealth regarded her as being disabled.  (Compl. at ¶20.)  Gembus further alleges that MetroHealth failed to reasonably accommodate her disability.  (Compl. at ¶¶ 18-19.)  Plaintiff appears to allege that she was disabled due to fibromyalgia and/or chronic fatigue syndrom ("CFS").[3]  Although Gembus's Complaint is vague, Count I also can reasonably be construed to contain an unlawful retaliation claim.

#### 1.  Failure to Accommodate Claim.

To establish a *prima facie* case of disability discrimination, Gembus must demonstrate

---

[3]  MetroHealth concedes that "[w]hile fibromyalgia and [CFS] are not per se physical or mental impairments specifically enumerated by [Ohio] R.C. §4112.01(A)(16)(a), ... they are physiological conditions that ... *could* be disabling."  (Def.'s Br. at 8) (emphasis added).  MetroHealth contends Gembus has not established in this case that her fibromyalgic condition was disabling.

7

the following: (1) that she was disabled, (2) that an adverse employment action was taken by

MetroHealth, at least in part, because she was disabled, and (3) that the Gembus, though

disabled, can safely and substantially perform the essential functions of the job in question with

or without accommodation. *See, e.g., City of Columbus Civ. Serv. Comm'n v. McGlone,* 82 Ohio

St. 3d 569, 571, 1998-Ohio-410, 697 N.E.2d 204 (Ohio 1998) *citing Hazlett v. Martin Chevrolet,*

*Inc.* (1986), 25 Ohio St.3d 279, 281, 496 N.E.2d 478, 480 (Ohio 1986); *House v. Kirtland*

*Capital Partners*, 158 Ohio App. 3d 68, 2004-Ohio-688, 814 N.E.2d 65, at ¶ 24 (Ohio Ct. App.

2004); *Mitnaul v. Fairmount Presbyterian Church*, 149 Ohio App. 3d 769, 2002-Ohio-5833; 778

N.E.2d 1093, ¶33 (Ohio Ct. App. 2002).

MetroHealth argues that it is entitled to summary judgment because Gembus cannot meet

her burden of showing that she was disabled. (Def.'s Br. at 7-8.) Gembus has presented

evidence that she suffers from fibromyalgia and CFS. However, "[n]ot every physical or mental

condition from which a person suffers constitutes a disability." *Jurczak v. J&R Schugel*

*Trucking Co.*, 2003 Ohio App. LEXIS 6362, 2003-Ohio-7039, ¶20 (Ohio Ct. App. 2003) *citing*

*Maloney v. Barberton Citizens Hosp.*, 109 Ohio App.3d 372, 377, 672 N.E.2d 223 (Ohio Ct.

App. 1996). Rather, Ohio R.C. § 4112.02 was designed to protect those "who live with a

handicap, or disability, that significantly affects the way they live their lives on a daily basis."

*Jurczak*, 2003-Ohio-7039 at ¶20 *citing Columbus Civ. Serv. Comm. v. McGlone* (1998), 82 Ohio

St.3d 569, 572, 1998-Ohio-410, 697 N.E.2d 204 (Ohio 1998). Ohio R.C. § 4112.01(A)(13)

defines disability as "a physical or mental impairment that substantially limits one or more major

life activities, including the functions of caring for one's self, performing manual tasks, walking,

seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental

impairment; or being regarded as having a physical or mental impairment."

According to a letter from Gembus's treating physician, she should be able to perform her job and is able to perform major life activities, albeit the latter activities become more difficult when her symptoms flare up.  (Reimer Aff. ¶9, attached Ex. K.)  Thus, Dr. Harrington's medical opinion does not support an argument that Gembus is substantially limited with respect to work or major life activities.  Gembus's brief in opposition is largely unresponsive to MetroHealth's motion for summary judgment on this particular issue.  (*See* Pl.'s Br. at 4-7.) Gembus fails to point to any evidence that she is disabled.  Instead, Gembus's argument in opposition focuses exclusively on her federal and state retaliation claims.

Because Gembus has failed to draw this Court's attention to any evidence that could support a finding that Gembus was disabled within the meaning of Ohio R.C. § 4112.02, MetroHealth's motion for summary judgment is GRANTED with respect to Gembus's failure to accommodate claim.[4]

### 2. Retaliation Claim.

Gembus also has asserted a retaliation claim pursuant to Ohio R.C.  § 4112.02.  The crux of Gembus's state retaliation claim appears to be the allegation that she was terminated because she asked for an accommodation.  (Pl.'s Br. at 5.)  Ohio R.C. § 4112.02(I) prohibits discrimination against an employee who has opposed any unlawful discriminatory practice.  In order to establish a *prima facie* case of retaliation, Gembus must prove the following: "(1) he

---

[4] Even if Gembus had presented sufficient evidence to support a finding that she was disabled, her claim would still fail as she cannot prevail on the remaining elements of her claim.  (*See* discussion of retaliation claims, *infra*.)

9

engaged in protected activity, (2) he was subjected to an adverse employment action, and (3) a

causal link exists between a protected activity and the adverse action." *Zivkovic v. Juniper*

*Networks, Inc.*, 450 F. Supp. 2d 815, 829 (N.D. Ohio 2006) *citing Crable v. Nestle USA, Inc.*,

2006-Ohio-2887, 2006 WL 1555405, ¶44 (Ohio Ct. App. 2006); *see also Carney v. Cleveland*

*Heights - Univ. Heights City Sch. Dist.*, 143 Ohio App.3d 415, 428, 758 N.E.2d 234 (Ohio Ct.

App. 2001).

Ohio courts look to federal case law when addressing retaliation claims. *See Filips v.*

*Case W. Reserve Univ.*, 2002 Ohio App. LEXIS 4576, 2002-Ohio-4428 ¶18 (Ohio Ct. App.

2002); *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Comm.*, 66

Ohio St. 2d 192, 196, 421 N.E.2d 128 (Ohio 1981) ("federal case law interpreting Title VII of

the Civil Rights Act of 1964, Section 2000(e) *et seq.*, Title 42, U. S. Code, is generally

applicable to cases involving alleged violations of [Ohio] R. C. Chapter 4112."); *Clark v. City of*

*Dublin*, 178 Fed. Appx. 522, 525 (6th Cir. 2006) ("Ohio state and federal courts rely on cases

interpreting the ADEA and ADA for guidance because of the parallels between ORC 4112 and

those federal statutes.")

If an employee presents evidence of a *prima facie* case of discrimination, an employer

must articulate some legitimate, non-discriminatory reason for the negative action to rebut the

presumption of discrimination created by the *prima facie* case. *See, e.g., Williams v. City of*

*Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268; 837 N.E.2d 1169, ¶12 (Ohio 2005) ("If the

employer submits admissible evidence that 'taken as true, would permit the conclusion that there

was a nondiscriminatory reason for the adverse action,' ... the presumption created by the prima

facie case drops from the case because the employer's evidence has rebutted the presumption of

10

discrimination."), *citing Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-254

(1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)  "For this showing, it is

important to note that this burden is one of production, not persuasion; it 'can involve no

credibility assessment.'" *Carney*, 143 Ohio App.3d at 429, *citing Reeves* v. *Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 143 (2000).

> The plaintiff retains the burden of persuasion.  [Once the employer proffers a non-
> discriminatory reason for termination, plaintiff] must have the opportunity to
> demonstrate that the proffered reason was not the true reason for the employment
> decision.  This burden ... merges with the ultimate burden of persuading the court
> that she has been the victim of intentional discrimination.  She may succeed in
> this either directly by persuading the court that a discriminatory reason more
> likely motivated the employer or indirectly by showing that the employer's
> proffered explanation is unworthy of credence.

*Burdine*, 450 U.S. at 256; *accord Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 800 (6th

Cir. 1998) ("Once the defendant [produces a legitimate, non-discriminatory reason] ..., the

plaintiff must present evidence sufficient to support an inference of pretext in order to survive a

defendant's motion for judgment as a matter of law."); *Leonard v. Towers*, 6 Fed. Appx. 223,

229 (6th Cir. 2001); *see also Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246 (6th Cir. 1997)

("[Plaintiff], who retains the burden of proof at all times, must produce sufficient evidence to

allow a jury to reasonably reject [the employer's non-discriminatory] explanation.");

Assuming for the sake of argument that Gembus has set forth a *prima facie* case of

retaliation, MetroHealth has articulated a legitimate, non-discriminatory reason for Gembus's

termination – chronic tardiness in violation of its employment rules.  To establish pretext,

Gembus must establish "(1) a direct evidentiary showing that a discriminatory reason more

likely motivated the employer or by (2) an indirect evidentiary showing that the employer's

explanation is not credible."  *Carney*, 143 Ohio App.3d at 429, *citing Texas Dep't of Community*

11

*Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089 (1981).  Pretext may be established by demonstrating the alleged non-discriminatory reason as false and that discrimination or retaliation were the real reasons. *Id. citing Powers v. Pinkerton, Inc.*, 2001 Ohio App. LEXIS 138 (Ohio Ct. App. 2001), 2001 Ohio App. LEXIS 138, 2001-Ohio-4119 at *11, *citing St. Mary's Honor Ctr.*, 509 U.S. at 510-511; *Williams*, 107 Ohio St.3d at 206.

Gembus, however, does not dispute that MetroHealth had a policy that called for termination of individuals who received more than twenty points for tardies in one twelve-month period, nor does she dispute that she had accumulated over twenty points for tardiness.  (*See generally* Gembus Depo.)  Rather, Gembus's only argument in response is that the reason for her termination was "illegitimate" because she was not compensated for the five minutes prior to the start of her shift contrary to the Fair Labor Standards Act.  (Pl.'s Memo. In Opp'n at 8-9).[5] Gembus's argument is unconvincing.  MetroHealth had a policy of allowing its employees to log out ten minutes prior to the end of their shift to allow for five minutes of cleaning, and this policy came into effect the same time as the policy requiring employees to arrive to log-in five minutes early.  (Gembus Depo. at 76-77.)  Gembus has not drawn the Court's attention to any evidence of record that suggests the policy allowing employees to log out ten minutes before the

---

[5]  Gembus's argument regarding the temporal proximity of her termination to her FMLA leave and/or accommodation request may be relevant to establishing her *prima facie* case, but does not alone demonstrate that the reason for her termination was pretext. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) ("[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual."); *DeBoer v. Musashi Auto Parts, Inc.*, 124 Fed. Appx. 387, 393 (6th Cir. 2005) (although temporal proximity alone is insufficient to establish that an employer's non-discriminatory reason is pretextual, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.")

12

end of their shift was a sham.  Thus, Gembus cannot reasonably argue that the five-minutes prior

to the start of her shift were uncompensated when she was allowed to leave five to ten minutes

early.  It follows that MetroHealth's policy did not violate the Fair Labor Standards Act

("FLSA"), as employees were compensated for the full amount of time actually spent working.

Furthermore, even if there was evidence that MetroHealth's policy violated the FLSA,

Gembus still must proffer evidence that a discriminatory or retaliatory reason was the likelier

motivation of her employer or that MetroHealth's explanation is not credible.  In other words, it

is not enough for Gembus to opine that MetroHealth's policy was illegal under the FLSA, as she

must present evidence that she was terminated for discriminatory or retaliatory reasons and not

because she violated another policy that allegedly offends a wholly different statute.

Because MetroHealth has come forward with a legitimate and non-discriminatory reason

for Gembus's termination, the presumption of intentional discrimination and/or retaliation

disappears.  *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003) (Once an employer

articulates a legitimate, non-discriminatory reason for its employment action, "the presumption

of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by ...

offering evidence demonstrating that the employer's explanation is pretextual.") *citing Reeves v.

Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097 (2000).  Therefore,

absent evidence that MetroHealth's tardiness explanation is merely pretext, Gembus's claim

cannot be sustained.  Therefore, MetroHealth's motion for summary judgment is GRANTED

with respect to Gembus's state retaliation claim.

**B.      FMLA Retaliation Claim**.

In Count II of her Complaint, Gembus alleges that she was terminated in retaliation for

taking medical leave under FMLA. (Compl. at ¶¶22-25.) Although a retaliation claim is not

expressly set forth in the FMLA statute on the face of the statute, "inherent within the exercise of

the right to leave under the FMLA is that an employer cannot later use that leave against the

employee. By doing so, the employer interferes with the ongoing protections that accompany

the right – protections that are part *prescriptive* in that the employer must afford the employee

the right to be free from retaliation, as well as part *proscriptive* in that an employer cannot

penalize an employee for invoking this or other FMLA rights." *Carpenter v. Kaiser*

*Permanente*, 2006 U.S. Dist. LEXIS 69564 (N.D. Ohio 2006) *quoting Welty v. Honda of*

*America Mfg., Inc.*, 411 F. Supp. 2d 824, 829 (S.D. Ohio 2005)(emphasis in original).

In order to establish a *prima facie* case of retaliation, Gembus must prove the following:

(1) she availed herself of a protected right under the FMLA; (2) MetroHealth knew of Gembus's

exercise of a protected right; (3) Gembus suffered an adverse employment action; and, (4) there

was a causal connection between her exercise of a protected right and the adverse employment

action. *See, e.g., Carpenter*, 2006 U.S. Dist. LEXIS 69564 at *42, *citing Canitia v. Yellow*

*Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990); *Arban v. West Publ'g Corp.*, 345 F.3d

390, 404 (6th Cir. 2003). Once a *prima facie* case is established, the burden shifts to the

MetroHealth to articulate a legitimate, non-discriminatory reason for Gembus's discharge. *See*

*Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). If MetroHealth

presents a legitimate, non-discriminatory reason for Gembus's discharge, then Gembus "has the

burden of showing that the articulated reason is in reality a pretext" masking retaliation. *Id*.

There is no substantive difference in the legal analysis between Gembus's state based

retaliation claim and her FMLA retaliation claim. As discussed above, MetroHealth has

14

proffered a legitimate, non-discriminatory reason for Gembus's termination, thereby negating the presumption of retaliation.  *See Raytheon Co.*, 540 U.S. at 50.  Gembus has not pointed to any evidence that would allow a reasonable juror to find that her termination was pretextual.  Again, Gembus relies on an alleged violation of FLSA to suggest that her termination was unlawful.  For the reasons discussed in the previous section, this argument is unconvincing.

Due to an absence of evidence suggesting that MetroHealth's tardiness explanation is pretext, Gembus's FMLA retaliation claim cannot be sustained.  Therefore, MetroHealth's motion for summary judgment is GRANTED with respect to Gembus's FMLA retaliation claim.

**C.      Ohio Public Policy Claim**.

In Count III of her Complaint, Gembus alleges that she was terminated contrary to Ohio public policy and in violation of Ohio law.  (Compl. at ¶27.)  MetroHealth argues that it is entitled to summary judgment on this claim.  (Def.'s Memo. at 15-17.)

Although MetroHealth concedes that a cause of action exists in tort for wrongful discharge in violation of public policy,[6] it avers that Ohio courts do not recognize such claims where a statutory cause of action is available that can provide sufficient relief.  *See, e.g., Wiles v.*

---

[6]  *See Greeley v. Miami Valley Maintenance Contractors, Inc.*, 49 Ohio St.3d 228, 235, 551 N.E.2d 981 (Ohio 1990) (finding that there is a "public policy exception to the employment-at-will doctrine based on violation of a specific statute.  This is not to say that there may not be other public policy exceptions to the doctrine but, of course, such exceptions would be required to be of equally serious import as the violation of a statute.  In Ohio, a cause of action for wrongful discharge in violation of public policy may be brought in tort."); *accord Painter v. Graley*, 70 Ohio St. 3d 377, 384, 639 N.E.2d 51 (Ohio 1994) (reaffirming *Greeley* and finding that "an exception to the employment-at-will doctrine is justified where an employer has discharged his employee in contravention of a 'sufficiently clear public policy.'  The existence of such a public policy may be discerned by the Ohio judiciary based on sources such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law.")

*Medina Auto Parts*, 96 Ohio St.3d 240, 773 N.E.2d 526 (Ohio 2002) (refusing to recognize an Ohio common law cause of action for wrongful discharge in violation of public policy based upon an employer's violation of FMLA, as "allowing such a claim is unnecessary to vindicate the policy goals of the FMLA ...."); *Provens v. Stark Cty. Bd. of Mental Retardation & Dev. Disabilities*, 64 Ohio St.3d 252, 261, 594 N.E.2d 959 (Ohio 1992) (finding that the statutory remedies available to the plaintiff were sufficient to address the employer's alleged wrongs and a *Greeley* claim was inapplicable); *Schwartz v. Comcorp, Inc.*, 91 Ohio App.3d 639, 633 N.E.2d 551, 557 (Ohio Ct. App. 1993) (*Greeley* "does not apply to situations where the statute containing the public policy which was allegedly violated contains within its provisions a specific civil legal remedy for its violation."); *Barlowe v. AAAA Int'l Driving*, 2003 Ohio App. LEXIS 5097, 2003-Ohio-5748 at ¶39 (Ohio Ct. App. 2003) ("remedies provided by R.C. 4112.99 provide broad relief which is sufficiently comprehensive to vindicate the policy goals set forth in that statute.")

Based upon a review of the allegations set forth in the Complaint, Ohio R.C. § 4112.99, and federal laws establishing the FMLA, 29 U.S.C. §§ 2611 *et seq*., provide sufficient statutory remedies and thereby preclude Gembus from asserting a public policy claim pursuant to *Greeley*. In her Memorandum in Opposition to MetroHealth's summary judgment motion, Gembus fails to makes any responsive argument and cites no law or fact to support her public policy claim.  At the summary judgment stage, Gembus may not rely on the mere allegations of her Complaint. MetroHealth's motion for summary judgment is GRANTED with respect to Gembus's Ohio public policy claim.

16

**V.  Conclusion**

For the foregoing reasons, MetroHealth's Motion for Summary Judgment is GRANTED

with respect to all claims contained in Gembus's Complaint.

IT IS SO ORDERED.


/s/ *Nancy A. Vecchiarelli*
U.S. MAGISTRATE JUDGE

Date: February 26, 2007.

17